STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

WCA 03-484


DARRELL RANEL

VERSUS

MCDONALD'S


**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 02-03699
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Billie Colombaro Woodard, Michael G. Sullivan, and Billy Howard Ezell, Judges.

                                      **REVERSED AND RENDERED.**


**Robert Dean Hoover**
**Attorney at Law**
**1737 Oakdale Drive**
**Baton Rouge, LA 70810**
**(225) 767-4880**
**Counsel for: Defendant/Appellee**
**McDonald's**

**Danny Wayne Sylvester  Jr. (Beau)**
**Tannehill & Sylvester**
**P. O. Box 3246**
**Pineville, LA 71361**
**(318) 641-1550**
**Counsel for: Plaintiff/Appellant**
**Darrell Ranel**

**EZELL, JUDGE**.

Darrell Ranel appeals a workers' compensation judgment holding that he was not entitled to supplemental earnings benefits (SEB). The trial court also refused to award penalties and attorney's fees for the employer's failure to approve medical treatment recommended by his treating physician. Additionally, Ranel claims he is entitled to penalties and attorney's fees for the untimely and unreasonable delay in paying indemnity benefits. Ranel also disagrees with the trial court's decision regarding the computation of offsets and credits due the employer from his other part-time jobs.

## FACTS

Ranel went to work for McDonald's in Alexandria on May 22, 2000, as a second assistant manager. On July 5, 2001, Ranel was injured in the course and scope of his employment with McDonald's. He was in the process of placing a cap on a bottle of soap when he slipped, his feet came from under him, and he fell on his buttocks. He tried to get up and slipped again, banging his knee against the steel mop rail. At first he thought he was going to be ok, but later he started having pain.

Ranel initially saw his family doctor, Dr. Gregory Bevels, on July 9. Subsequently, McDonald's sent him to Rapides Industrial Medicine, where he was seen by Dr. Robert Smith on July 17, 2001. X-rays revealed minimal scoliosis with minimal L5/S1 disc space narrowing. He was placed on anti-inflammatory medication, and an MRI was ordered. During this time, Ranel continued working at McDonald's, but with restrictions.

Ranel's MRI indicated degenerative changes at L5/S1 with a mild, mainly central, bulging disc with no significant compromise. Minimal indentation in the anterior thecal sac area was also observed. Dr. Smith noted that these findings were consistent with Ranel's presentation. Dr. Smith continued treating Ranel and kept his

1

status as working with restrictions. Dr. Smith referred Ranel to a neurosurgeon, Dr. Lawrence Drerup.

Dr. Drerup saw Ranel on October 23, 2001. At that time, Dr. Drerup planned to treat Ranel with an epidural steroid injection with a root block at S1 and epidural steroid injections.

Dr. Smith saw Ranel on November 12, 2001, maintaining Ranel's modified work status. Dr. Smith noted that he would see Ranel again following his discharge from neurosurgery.

On November 29, 2001, Dr. Drerup placed Ranel on a no-work status. Then, effective December 18, 2001, Dr. Drerup released Ranel back to light duty. However, Dr. Drerup again placed Ranel on a no-work status from January 15, 2002 to March 1, 2002.

Ranel last saw Dr. Drerup on May 2, 2002, having undergone a lumbar myelogram and post myelographic CT, which appeared normal. Dr. Drerup reported that Ranel did not require further neurosurgical intervention or evaluation, so he referred Ranel to Dr. Smith to continue under his care.

Dr. Smith saw Ranel on May 10, 2002. At that time he reported that he had nothing to offer Ranel except to get some opinions from other people who could help him manage long-term. Dr. Smith made three referrals: (1) to physical medicine and rehabilitation for an impairment rating, (2) to Dr. Stephen Katz for long-term, chronic pain management, and (3) to Dr. James Quillan for an MMPI (Minnesota Multiphasic Personality Inventory) and psychological assessment. Also, at this time, Dr. Smith recommended modified work duties. On July 9, 2002, Dr. Smith was provided with a job assessment of swing manager but did not find this position medically appropriate. Ranel last saw Dr. Smith on July 16, 2002, at which time Dr. Smith continued Ranel on a modified work status.

McDonald's wanted a second opinion before it would approve the recommended referrals of Dr. Smith. Dr. Robert Rush evaluated Ranel on July 12, 2002. Dr. Rush opined that Ranel suffers with L4-L5 degenerative disc with bulge, chronic pain syndrome, and facet changes at L5-S1. He did not find Ranel a candidate for surgical intervention, but recommended a good work hardening program with epidural steroid injections. Dr. Rush also opined that Ranel is unable to work at the time pending the medical treatment recommendations suggested by Dr. Rush.

Ranel stopped working for McDonald's in January 2002, when Dr. Drerup restricted him from working. He has not returned to work with McDonald's since that time. However, while working for McDonald's, Ranel had other employment which he has continued with even after his injury. He is the pastor at St. James A.M.E. Church in Mansfield, where he earns $800 a month. Ranel is also the gospel program director at KAYT radio where he is paid $6.50 for one hour of work a day, five days a week, plus fifteen percent commission on any advertisements he sells. Ranel received temporary total disability benefits (TTD) from the end of January 2002 to the end of April 2002. On May 1, 2002, Ranel's benefits were converted to SEB, and payment for the month of May was made on July 31, 2002. He also received a check on July 31, 2002, for the month of June SEB. He received a final payment of SEB on August 22, 2002, for the month of July. No further benefits have been paid.

Ranel filed this workers' compensation claim on May 8, 2002, after TTD ceased and before SEB started. Trial on the matter was on November 20, 2002. The workers' compensation judge (WCJ) found that no SEB were due and denied Ranel's other claims. Ranel appealed that judgment.

**SUPPLEMENTAL EARNINGS BENEFITS**

3

Ranel claims that the WCJ exceeded his powers by ruling on Ranel's entitlement to SEB when the issue of entitlement to benefits was not in dispute by the parties at the trial of this matter. Ranel argues that the pleadings, pre-trial statements, and pre-trial conferences never put his entitlement to benefits at issue. In defense, McDonald's refers to Attachment A attached to its answer which it argues raised the issue of entitlement to benefits. Ranel claims that this exhibit is not part of the record and cannot be relied upon.

McDonald's answer clearly refers to Attachment A. A review of the entire record reveals that Attachment A is located later in the record attached to the answer. Furthermore, at the time Ranel filed his disputed claim, he was no longer receiving any benefits, so one can assume that when the disputed claim for termination of benefits was filed and he checked the box on the claim form for items under dispute "Wage benefits terminated or reduced on," that the entitlement to benefits was disputed. Therefore, we find it proper to consider this as part of McDonald's answer which squarely puts Ranel's entitlement to SEB at issue.

Ranel claims the WCJ erred in finding that he was not entitled to SEB. Ranel claims that McDonald's failure to timely approve the recommended referrals of Dr. Smith denied him the opportunity to present evidence to support his entitlement to benefits. McDonald's alleges that Dr. Smith released Ranel to return to light-duty work and it offered him employment. It also argues that Ranel refused to participate in vocational rehabilitation in late May and early June, 2002.

> "The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." An employee is entitled to receive supplemental earnings benefits (SEBs) if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. LA.REV.STATE.ANN. § 23:1221(3)(a) (West Supp.1997). Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. "Th[is]

4

analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage."

Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. LA.REV.STATE.ANN. § 23:1221(3)(c)(I) (West Supp.1997). Actual job placement is not required. The amount of SEBs is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. LA.REV.STATE.ANN.§ 23:1221(3)(c)(a)(West Supp.1997)

. . . .

. . . . we conclude that an employer may discharge its burden of proving job availability by establishing, at a minimum, the following, by competent evidence:

(1)     the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region.

(2)     the amount of wages that an employee with claimant's experience and training can be expected to earn in the job; and

(3)     an actual position available for that particular job at the time that the claimant received notification of the job's existence.

By "suitable job," we mean a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education.

*Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840, pp. 8-11 (La. 7/1/97),

696 So.2d 551, 556-57(quoting *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d

52, 55(La.1993); *Freeman v. Poulan/Weed Eater*, 93-1530, p. 7 (La. 1/14/94), 630

so.2d 733, 739; *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1007 (La.1989))

(case citations omitted)(alteration in original).

5

Dr. Drerup had placed Ranel on a no-work status from January 15, 2002 to March 1, 2002. There is no indication of Ranel's work status after March 1 until May 10, 2002, when Dr. Smith placed Ranel on light-duty.

Blake Stevens, a vocational rehabilitation counselor with McNabb Rehabilitation Services, testified about the efforts to return Ranel to work. He met with several doctors for vocational/medical consultations including Dr. Smith, Dr. Robert Rush, who performed a one-time evaluation, Dr. Rayland Beurlot, who performed an EMG and nerve conduction studies, and Dr. Jack Hurst, who preformed a one-time neurosurgical second medical opinion.

Blake's consultations revealed the following. In November 2001, Dr. Beurlot opined that Ranel was capable of returning to work but referred him back to Dr. Smith. Dr. Hurst saw Ranel in April 2002 and approved Ranel to return to work at his pre-injury position of swing manager. In July 2002, Dr. Smith made his recommendations for referrals for medical treatment but found that the position of swing manager was not appropriate for Ranel. Dr. Rush agreed with Dr. Smith's recommendations for medical treatment and opined that Ranel was unable to return to work pending medical treatment.

Blake testified that he and Glenda Stock, owner/operator of McDonald's, tried to meet with Ranel about modified work, but Ranel would not come indicating he was still in continuous pain and under his doctor's care. Stock explained that she heard Ranel was not at the meeting because his attorney had not been notified about the meeting.

Stock testified that she encouraged Ranel to keep in touch with her on his status. She stated that she never told Ranel he could not come back to work and he

has not contacted her about coming back to work.

We agree with the WCJ that the evidence is clear that Ranel could return to work at a light-duty position, relying on Dr. Smith's notes as the WCJ did. However, the evidence is clear and undisputed that the position that was available to Ranel, swing manager, was not appropriate. Only one doctor, Dr. Hurst, who saw Ranel one time, approved this position. Dr. Smith specifically disapproved the position, and Dr. Rush agreed with Dr. Smith's recommendations. Even Dr. Beurlot, who reported that Ranel could work, but did not comment on the position of swing manager, referred Ranel back to Dr. Smith's care.

Furthermore, there is no evidence that any particular job or formal offer was ever made to Ranel. Stock indicated that she was waiting for Ranel to approach her about coming back to work. It is the employer's responsibility to offer an actual position within the employee's capabilities to the employee, indicating a specific wage. We find that McDonald's failed to sustain its burden of proving the existence of an actual position within Ranel's physical capabilities. The WCJ erred in failing to award SEB.

## WAGE BENEFIT COMPUTATION

Ranel claims the WCJ erred in determining that the correct method for computing his wage benefits was to use all wages from all sources of employment and allow a credit or offset for increased earnings after the date of injury. At the time of Ranel's accident, he was working three jobs: his full-time job with McDonald's earning $1,600 a month, a part-time job at KAYT Radio earning $350 a month plus commission on advertising sales, and a part-time job as pastor at St. James A.M.E. Church in Mansfield earning $800 a month. It is the income from all three of these

jobs that the WCJ thought should be utilized in calculating Ranel's wage benefits.

The WCJ never made any award of benefits, so his proposed calculation he mentioned in oral reasons for judgment was never actually used in calculating any benefits. However, Myrna Cannon, the workers' compensation claims supervisor on Ranel's case, testified that she took credit for anything over the $350 that Ranel earned at his job with the radio station. Therefore, we find it proper to address what the proper calculation of Ranel's SEB should be.

The leading cases on this point which were cited by the parties and the WCJ are *Phillips v. United Parcel Service*, 28,110 (La.App. 2 Cir. 2/28/96), 669 So.2d 1375 and *Gracianette v. Emeril's Restaurant*, 99-981 (La.App. 4 Cir. 4/5/00), 761 So.2d 34. Both of these cases rely on La.R.S. 23:1021(10)(a)(iv), which provides for the calculation of the average weekly wage of part-time employees who are employed on an hourly basis. This is not the situation here. Ranel was injured and placed on light-duty status from his full-time job where he is paid monthly. He was able to continue earning the income he earned before at his part-time jobs and is not claiming a loss of income from those jobs as a result of the accident at his full-time job with McDonald's. Therefore, Ranel's average weekly wage should be computed using La.R.S. 23:1021(10)(b) to calculate the SEB he is entitled to as a result of not being able to work at his full-time job at McDonald's.

**PENALTIES AND ATTORNEY'S FEES**

Ranel finally claims that the WCJ was clearly wrong in finding that the employer was reasonable in its efforts in seeking a second medical opinion with respect to the medical referrals recommended by Dr. Smith and penalties and attorney's fees are appropriate for McDonald's lack of effort. Ranel also claims that McDonald's actions in failing to pay timely benefits at two different times subjected it to penalties and attorney's fees.

8

The WCJ did not have to consider penalties and attorney's fees for failure to timely pay Ranel's benefits because the WCJ found that no benefits were due Ranel. The WCJ did find that Ranel was not entitled to penalties and attorney's fees for failure to timely authorize medical treatment when it sought a second opinion on the medical referrals as suggested by Dr. Smith.

Recognizing that the determination of whether an employer or insurer should be cast with penalties and attorney's fees is a question of fact subject to the manifest error standard of review, we will apply this standard to the WCJ's finding regarding the authorization of medical treatment only. *Authement v. Shappert Engineering*, 02-1631 (La. 2/25/03), 840 So.2d 1181. As to the award of penalties and attorney's fees for the failure to timely pay benefits, we will make a de novo review of the record since this issue was not considered by the WCJ. We are also mindful that the award of penalties and attorney's fees in workers' compensation cases is penal in nature, imposed to discourage indifference and the undesirable conduct of employers and insurers. *Fontenot v. Reddell Vidrine Water District, et al*, 02-439, 02-442, 02-478 (La. 1/14/03), 836 So.2d 14.

**Medical Treatment**

Unless the claim is reasonably controverted, a penalty and attorney's fees can be imposed for failure to authorize medical treatment. La.R.S. 23:1201(F)(2); *Authement*, 840 So.2d 1181. The WCJ concluded that McDonald's was reasonable in its efforts seeking a second opinion with respect to the referrals recommended by Dr. Smith and acted timely in authorizing those referrals.

On May 10, 2002, Dr. Smith made referrals for Ranel's medical treatment. An appointment for a second medical opinion was scheduled on June 28 for a July 12 appointment with Dr. Rush, who agreed with Dr. Smith's recommendations. Treatment was then authorized by McDonald's. We cannot say that the WCJ's

9

conclusion that McDonald's acted reasonably in authorizing the recommended medical treatment was clearly wrong.

**Payment of Benefits**

Louisiana Revised Statute 23:1201 authorizes the award of both penalties and attorney's fees if continued benefits are not paid timely. *Williams v. Rush Masonry, Inc.*, 98-2271 (La. 6/29/99), 737 So.2d 41. When the claim is "reasonably controverted," or the nonpayment results from conditions over which the employer and insurer have no control, penalties and attorney's fees are not available. *Id*. "'[U]nreasonably controverting a claim . . . requires action of a less egregious nature than that required for arbitrary and capricious behavior.'" *Fontenot*, 836 So.2d at 21 (quoting *Brown v. Texas-La. Cartage, Inc.*, 98-1063, p.8 (La. 12/1/98), 721 So.2d 885, 890).

Ranel argues that he has two penalty actions for failure to timely pay benefits. The first time occurred in May when his benefits were converted from TTD to SEB. Ranel did not receive a check for the months of May and June until July 31, 2002. A "Notice of Payment" form was sent by Cannon to the Office of Workers' Compensation indicating that payment of SEB would begin on May 1, 2002. Cannon testified that payment was delayed until receipt of the monthly earnings statements from Ranel. She used these earnings statements to take credits on anything she paid him. No other explanation was offered as to the reason that it was three months before Ranel received any benefits, especially since during this time, McDonald's own second opinion doctor, Dr. Rush, indicated that Ranel was not able to work pending treatment when he saw him on July 12. We find an award of penalties and attorney's fees appropriate for failure to timely pay Ranel's claim for May and June 2002.

The second action arises from the failure to pay benefits for the months of September and October 2002. Cannon testified at the trial in November that no

10

benefits had been paid since August. She explained that there was some confusion because the Office of Child Support Enforcement had called her and told her that it was supposed to receive child support. She explained that she had made a payment but it went to a closed account so Ranel did not get credit for the payment, so she waited until she got clarification from child support. She finally got two orders, in August and October, clarifying what the payment should be. At the trial on the matter, November 20, 2002, Cannon still had not issued any benefit checks but stated that they were in the process.

We find that there was no reasonable contravention by McDonald's and award penalties and attorney's fees for failure to timely pay SEB at this time. Ranel had already gone several months without payment. There was no excuse for not paying him once the court orders were in.

Therefore, pursuant to La.R.S. 23: 1201(F), we award a $2,000 penalty for each failure to timely pay Ranel his SEB benefits for a total penalty of $4,000. We also award $2,500 in attorney's fees for each instance for the work performed at the trial level and on appeal in pursuing each claim for a total award of $5,000 in attorney's fees.

For these reasons, the judgment of the Office of Workers' Compensation is reversed. Ranel is entitled to SEB beginning May 1, 2002. We also award $4,000 in penalties and $5,000 in attorney's fees. Costs of this appeal are assessed to Golden Stock Enterprises d/b/a McDonald's.

**REVERSED AND RENDERED.**

11